(Slip Opinion) OCTOBER TERM, 2025 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONSANTO CO. *v.* DURNELL

### CERTIORARI TO THE COURT OF APPEALS OF MISSOURI, EASTERN DISTRICT

No. 24–1068.   Argued April 27, 2026—Decided June 25, 2026

Monsanto Company manufactures and distributes Roundup, a glyphosate-based herbicide designed to control weeds.  The EPA has repeatedly evaluated glyphosate and repeatedly concluded that glyphosate is not likely to cause cancer.  EPA's assessment is shared by many other regulatory bodies around the world.  In accordance with EPA's view that glyphosate is not likely to cause cancer in humans, EPA has not required labels on glyphosate-based pesticides like Roundup to include a cancer warning.

In 2019, John Durnell sued Monsanto in Missouri state court, alleging that he had used Monsanto's Roundup products for about 20 years and that they had caused his non-Hodgkin's lymphoma.  As relevant here, Durnell brought a failure-to-warn tort claim, asserting that Monsanto should have included a cancer warning on Roundup's label.  A jury agreed and awarded Durnell more than $1 million on the failure-to-warn theory.  On appeal, the Missouri Court of Appeals affirmed, 707 S. W. 3d 828.  The Court of Appeals rejected Monsanto's argument that the Federal Insecticide, Fungicide, and Rodenticide Act expressly preempted Durnell's failure-to-warn claim, see 7 U. S. C. §136v(b).  This Court granted certiorari.

*Held*: FIFRA expressly preempts Durnell's state-law failure-to-warn claim because the claim would require Monsanto to add a cancer warning to Roundup's label. Pp. 9–22.

   (a) FIFRA's preemption clause, entitled "Uniformity," provides that a "State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."   7 U. S. C. §136v(b).   FIFRA therefore preempts a state-law labeling requirement that differs from the

federal labeling requirements imposed under FIFRA.  Pp. 9–14.

(1)  To register a pesticide, EPA must approve the pesticide's label by determining that the label contains all warnings "necessary and . . . adequate to protect health and the environment" and that the label does not include any "false or misleading" statements.  §§136a(c)(5)(B), 136(q)(1)(A), (G).  After EPA approves a pesticide's label at registration, manufacturers are legally *required* to use that label unless and until EPA approves or requires a label change and amends the pesticide's registration.  See §136a(f)(1); 40 CFR §§152.44(a), 156.70(c).  If a manufacturer does not use the EPA-approved label, it may be subject to civil and criminal penalties.  See 7 U. S. C. §§136*l*, 136j(a)(1)(E).

Federal law therefore requires Monsanto to sell Roundup with the label that EPA approved at the initial registration and that EPA has subsequently re-approved on multiple occasions—that is, the label without a cancer warning.  Meanwhile, as the Court's precedents make clear and as the parties agree, state tort duties constitute state labeling requirements.  See *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 443–444.  Durnell's state tort claim would require Monsanto to add a cancer warning to its labels, which is "in addition to" and "different from" Monsanto's federal-law labeling obligations.  Pp. 9–11.

(2)  The Court's decision in *Riegel* v. *Medtronic, Inc.*, 552 U. S. 312, further confirms that Durnell's failure-to-warn claim is expressly preempted.  In *Riegel*, the Court addressed the preemption clause in the Medical Device Amendments of 1976, which is nearly identical to FIFRA's preemption clause.  *Id.*, at 316; see 21 U. S. C. §360k(a).  The *Riegel* Court concluded that FDA's premarket approval of devices imposed "'requirements' under" the Act's preemption clause, 552 U. S., at 322, and therefore that FDA's premarket approval of a medical device preempted state-law claims premised on additional or contrary safety requirements.  *Id.*, at 323–325.  Pp. 11–14.

(b) Durnell's counterarguments are unpersuasive.  Pp. 14–22.

(1) Durnell contends that a Missouri failure-to-warn claim, like FIFRA itself, simply requires manufacturers to include adequate warnings to protect human health and not to include false or misleading statements.  But that argument operates at far too high a level of generality and disregards the central and comprehensive role that EPA performs in making labeling determinations under FIFRA's registration provisions.  Pp. 14–15.

(2) Durnell argues that EPA's regulations and its procedures for registering pesticides and approving pesticide labels exceed or contravene EPA's statutory authority under FIFRA.  Durnell is incorrect.  FIFRA empowers EPA to "prescribe regulations to carry out the provisions of [FIFRA]," §136w(a)(1), and expressly directs EPA to register pesticides and "determin[e]" that the pesticide's "labeling" complies

with FIFRA's many specific requirements. §136a(c)(5)(B). During that extensive registration process, EPA critically evaluates the pesticide's label to ensure that the label contains all warnings necessary to protect human health. And after EPA decides the appropriate warnings for a pesticide's label, a manufacturer is legally required to use that label unless and until EPA subsequently approves or requires a new label. 40 CFR §§152.44(a), 156.70(c). Pp. 15–16.

(3) Durnell seizes on 7 U. S. C. §136a(f)(2), which provides that registration shall not be "construed as a defense for the commission of any offense under [FIFRA]," but that registration is "prima facie" evidence of compliance with the registration provisions. By its text, §136a(f)(2) does not apply to state tort suits; that provision simply clarifies that registration does not bar EPA enforcement actions against manufacturers for violating FIFRA. Additionally, Monsanto is not invoking the mere fact of "registration" as a complete defense to state tort suits but rather is relying on EPA's specific determination that cancer warnings are not required for glyphosate-based pesticide labels. This argument also contravenes *Riegel*, where the possibility that FDA could withdraw its premarket approval based on new evidence or new analysis did not preclude the Court from concluding that FDA's premarket approval imposed "requirements" on manufacturers that preempted state tort suits under the Medical Device Amendments' materially identical preemption clause. 552 U. S., at 322–323. Pp. 16–20.

707 S. W. 3d 828, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, SOTOMAYOR, KAGAN, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion. JACKSON, J., filed a dissenting opinion, in which GORSUCH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES
_____

No. 24–1068
_____

## MONSANTO COMPANY, PETITIONER *v.* JOHN L. DURNELL

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MISSOURI, EASTERN DISTRICT

[June 25, 2026]

JUSTICE KAVANAUGH delivered the opinion of the Court.

Under authority granted by the Federal Insecticide, Fungicide, and Rodenticide Act, the Environmental Protection Agency regulates pesticides, including pesticide labels. As relevant here, EPA regulates Roundup, a glyphosate-based pesticide manufactured by Monsanto. Because EPA has repeatedly concluded that glyphosate is not likely to cause cancer, the agency has not required a cancer warning on Roundup's label. Importantly, EPA's regulations require a pesticide manufacturer such as Monsanto to use the EPA-approved pesticide label—here, the Roundup label without a cancer warning—unless and until EPA approves or requires a different label. Moreover, to ensure "[u]niformity" in labeling, FIFRA's preemption clause prohibits States from imposing any pesticide labeling requirements that are "in addition to or different from" the federal labeling requirements "under" FIFRA. 7 U. S. C. §136v(b).

John Durnell brought a failure-to-warn tort suit in Missouri state court against Monsanto for not including a cancer warning on Roundup's label. Durnell alleged that

Monsanto failed to warn him of Roundup's cancer risks and that he developed non-Hodgkin's lymphoma as a result.

But Durnell's state tort claim would require Monsanto to add a cancer warning to Roundup's label even though federal law requires Monsanto to use the EPA-approved label without a cancer warning. Because Durnell's state tort claim would impose a pesticide labeling requirement "in addition to or different from" the label required by EPA, FIFRA expressly preempts Durnell's claim.

## I

### A

In 1947, Congress passed and President Truman signed the Federal Insecticide, Fungicide, and Rodenticide Act. 61 Stat. 163, as amended, 7 U. S. C. §136 *et seq.* The 1947 Act required that pesticides be registered with the Secretary of Agriculture. But the Act assigned the Secretary a relatively passive role; the Secretary could not refuse to register a pesticide. 61 Stat. 167–168.

In 1972, Congress passed and President Nixon signed the Federal Environmental Pesticide Control Act. 86 Stat. 973. That Act "transformed" FIFRA "into a comprehensive regulatory statute" and placed the newly created Environmental Protection Agency in charge of pesticide registration and labeling. *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 437 (2005) (quotation marks omitted). In doing so, Congress "significantly strengthened FIFRA's registration and labeling standards" and granted "increased enforcement authority" to EPA. *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597, 601 (1991).

Under that revamped regulatory regime, which still governs today, pesticides must be registered with EPA. §§136a(a), 136j(a)(1)(A). Before registering a pesticide, EPA undertakes an extensive review of the pesticide and its proposed labeling. Pesticide manufacturers must submit information about the pesticides' formulas,

potential adverse effects, and testing. §§136a(c)(1)(A)–(F), (2); 40 CFR §152.50(f)(3) (2025). Manufacturers must also propose a label for their products, which must include any necessary precautionary statements. 7 U. S. C. §136a(c)(1)(C); 40 CFR §156.10(a)(1)(vii).

EPA must then review all of that information and data. To register a pesticide, EPA must conclude that the pesticide "will not generally cause unreasonable adverse effects" on human health and the environment, and that its labeling "compl[ies] with the requirements" of FIFRA. 7 U. S. C. §§136a(c)(5)(B), (D).

As to the label, FIFRA requires that a pesticide not be "misbranded." §136j(a)(1)(E). A pesticide is misbranded if its label contains "any statement" that is "false or misleading" or if the label does not contain "a warning or caution statement which may be necessary and . . . adequate to protect health and the environment." §§136(q)(1)(A), (G). FIFRA defines "protect health and the environment" to mean "protection against any unreasonable adverse effects on the environment," including "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." §§136(x), (bb).

FIFRA authorizes EPA to issue regulations to "carry out the provisions of" FIFRA. §136w(a)(1). Under that statutory authority, EPA has promulgated extensive regulations fleshing out what it means for a pesticide to be misbranded and dictating what must appear on a pesticide's label. See, *e.g.*, 40 CFR §156.10 (Labeling requirements). As relevant here, those regulations specify the required content and placement of precautionary statements such as cancer warnings. See §§156.60–156.70 (Human Hazard and Precautionary Statements).

Putting all of that together, before registering a pesticide, EPA must evaluate a pesticide and its proposed label—and

must determine that the proposed label includes all warnings necessary and adequate to protect human health and the environment, and is not false or misleading. EPA's registration of the pesticide and approval of the pesticide's label embodies the agency's considered judgment that a pesticide is not misbranded—that is, that the label is not false or misleading and does not omit a necessary warning. See 7 U. S. C. §§136a(c)(5)(B), 136(q)(1)(A), (G).

Importantly, after EPA has registered the pesticide and approved the label, the manufacturer is required to use that label. Subject to narrow exceptions not relevant here, the manufacturer may not change the label unless EPA subsequently approves a manufacturer's proposed change or EPA itself requires a change to the label. See 40 CFR §§152.44(a), 156.70(c). If a manufacturer does not use the EPA-approved label, it may be subject to civil and criminal penalties. See 7 U. S. C. §§136j(a)(1)(E) (misbranding violation), 136*l* (civil and criminal penalties). In particular, EPA may bring enforcement actions against a manufacturer for violating FIFRA's misbranding provisions—which could happen, for example, if a manufacturer sells its pesticide with a different label than the one EPA approved. If EPA determines that a given warning is necessary for a pesticide's label and the manufacturer then proceeds to sell the pesticide *without* that warning, the manufacturer might face liability for misbranding.[1]

EPA's comprehensive regulatory role does not end with the pesticide's initial registration and label approval. If the manufacturer wants to modify the label, it typically must

---

[1] Registration carries other consequences, too. FIFRA prohibits selling a pesticide "if any claims made for it . . . substantially differ" from any claims made in "the statement required in connection with its registration." 7 U. S. C. §136j(a)(1)(B). And FIFRA prohibits selling a pesticide if its "composition" differs from the composition described at registration. §136j(a)(1)(C).

go through an amended registration process. FIFRA provides that if "the labeling . . . for a pesticide is changed, the registration shall be amended to reflect such change if the [EPA] Administrator determines that the change will not violate" FIFRA. §136a(f)(1). EPA regulations further provide that "any modification" to the "labeling" of a "registered product must be submitted with an application for amended registration." 40 CFR §152.44(a); see §152.50 (listing required contents of registration and amended registration applications).

EPA also possesses a slew of tools to monitor the pesticide market and scientific developments, and thereby ensure that pesticide labels contain appropriate warnings in light of changed circumstances or new information. After the initial registration and approval of a label, manufacturers must continue to inform EPA of "additional factual information regarding unreasonable adverse effects" of their pesticides. 7 U. S. C. §136d(a)(2). That obligation is enforced through civil and criminal penalties. See §136*l*. EPA may also "determin[e] that additional data are required to maintain in effect an existing registration of a pesticide," and therefore request more information from the manufacturers. §§136a(c)(2)(B)(i)–(ii). In that circumstance, manufacturers must take appropriate steps to disclose that new evidence or face suspension of their pesticides' registration. §136a(c)(2)(B)(iv). In light of new information or analysis by EPA, the agency at any time may require "additional labeling language" to "mitigate" "identified hazard(s)." 40 CFR §152.170(e)(1). EPA also must formally review a pesticide's registration every 15 years. 7 U. S. C. §§136a(g)(1)(A)(iii)–(iv).

In addition, EPA may cancel a pesticide's registration, and thereby prohibit its continued sale, if "it appears to the Administrator that a pesticide or its labeling . . . does not comply with" FIFRA. §136d(b). EPA may also immediately suspend a pesticide's registration if "necessary to prevent

an imminent hazard" while a cancellation is pending. §136d(c)(1).

On top of EPA's own authority to monitor a pesticide's continued safety and order appropriate changes such as a new label, any person can petition EPA to modify, suspend, or cancel a pesticide's registration based on, for example, new evidence about the dangers of the pesticide.  40 CFR §154.10.  If EPA refuses to do so, a party may seek judicial review of EPA's decision.  7 U. S. C. §§136n(a), 136d(h).

Finally, and crucially for this case, FIFRA includes a preemption clause that further underscores EPA's comprehensive and exclusive authority in registering pesticides and approving labels.  In a provision entitled "Uniformity"—a title that was added in a public law enacted by Congress in 1988, not by the codifiers—FIFRA prohibits States from imposing "any requirements for labeling or packaging in addition to or different from those required under" FIFRA.  §136v(b); Federal Insecticide, Fungicide, and Rodenticide Act Amendments of 1988, 102 Stat. 2654, 2687.[2]

## B

Monsanto Company is a subsidiary of Bayer AG. Monsanto manufactures and distributes Roundup, a glyphosate-based herbicide designed to control weeds.[3]

In 1974, EPA first registered glyphosate-based pesticides and approved Roundup's label without a cancer warning. In 1991 and for the more than three decades since, EPA has repeatedly re-evaluated glyphosate and has repeatedly concluded that glyphosate is not likely to cause cancer.  For

---

[2] States remain free to "regulate the sale or use of any federally registered pesticide." §136v(a).  For example, a State could outright ban a pesticide within its borders.

[3] Pesticide is an umbrella term that covers any substance "intended for preventing, destroying, repelling, or mitigating any pest." §136(u).  A herbicide is a kind of pesticide that specifically targets weeds.

example, in 1991, EPA classified glyphosate as unlikely to cause cancer in humans. See EPA, Office of Pesticides and Toxic Substances, Second Peer Review of Glyphosate 1 (Oct. 30, 1991). In 1993, EPA reiterated that conclusion and re-registered glyphosate products without a cancer warning. See EPA, Office of Prevention, Pesticides and Toxic Substances, Reregistration Eligibility Decision: Glyphosate 13–14 (Sept. 1993).

In 2017 and 2019, after the International Agency for Research on Cancer classified glyphosate as a probable carcinogen, EPA re-examined the issue but still adhered to its longstanding position on glyphosate. See EPA, Office of Pesticide Programs, Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential 12–13, 144 (Dec. 12, 2017); EPA, Glyphosate: Proposed Interim Registration Review Decision 7–8 (Apr. 2019). In 2020, in an interim registration review decision, EPA reiterated that same position. See EPA, Glyphosate: Interim Registration Review Decision Case No. 0178, p. 10 (Jan. 2020); *Natural Resources Defense Council* v. *EPA*, 38 F. 4th 34, 51 (CA9 2022) (vacating EPA's 2020 decision regarding glyphosate).

EPA's assessment of glyphosate is shared by many other regulatory bodies around the world that have likewise concluded that glyphosate is not carcinogenic, including regulators in Canada, Australia, Japan, and the European Union.

All told, in accordance with EPA's view that glyphosate is not likely to cause cancer in humans, EPA has not required glyphosate-based pesticides like Roundup to include a cancer warning on their labels.[4] Therefore, as a matter of federal law, Monsanto legally must use a label without a cancer warning unless and until EPA approves or requires a change.

―――――――――

[4] Monsanto has phased out residential Roundup products that contain glyphosate.

C

In 2019, John Durnell sued Monsanto in Missouri state court. Durnell alleged that he had used Monsanto's Roundup products for about 20 years and that they had caused his non-Hodgkin's lymphoma, a form of cancer. As relevant here, Durnell brought a failure-to-warn tort claim, claiming that Monsanto should have included a cancer warning on Roundup's label. A jury agreed and awarded Durnell more than $1 million on the failure-to-warn theory.

In Missouri trial court, Monsanto moved on preemption grounds for judgment notwithstanding the verdict. Monsanto argued that FIFRA expressly preempted Durnell's failure-to-warn claim because FIFRA prohibits States from imposing labeling requirements that are "in addition to or different from" those imposed under FIFRA. 7 U. S. C. §136v(b). Monsanto explained that EPA approved its labels without a cancer warning at registration and that it was therefore able to (indeed, required to) keep using that label.

The Missouri trial court rejected Monsanto's preemption argument. The Missouri Court of Appeals affirmed. 707 S. W. 3d 828 (2025). The Court of Appeals reasoned that Missouri failure-to-warn claims are "fully consistent with" FIFRA's misbranding provisions because "both require a pesticide manufacturer to adequately warn users of the potential dangers of using its product." *Id*., at 832–833.

The federal Courts of Appeals and state courts have divided over whether FIFRA preempts a state tort claim based on Roundup's lack of a cancer warning. Compare *Schaffner* v. *Monsanto Corp.*, 113 F. 4th 364 (CA3 2024), with *Carson* v. *Monsanto Co.*, 92 F. 4th 980 (CA11 2024); *Hardeman* v. *Monsanto Co.*, 997 F. 3d 941 (CA9 2021); *Johnson* v. *Monsanto Co.*, 333 Ore. App. 678, 554 P. 3d 290 (2024); *Pilliod* v. *Monsanto Co.*, 67 Cal. App. 5th 591, 282 Cal. Rptr. 3d 679 (2021).

To resolve that split, this Court granted certiorari. 607 U. S. 1148 (2026).

## II

FIFRA's preemption clause is entitled "Uniformity" and provides that a "State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U. S. C. §136v(b). FIFRA therefore preempts a state-law labeling requirement that differs from the federal labeling requirements imposed under FIFRA. "Uniformity" in labeling—the textually stated objective of FIFRA's preemption clause—would otherwise be impossible to achieve. *Ibid.*

### A

To start, as this Court's precedents make clear and as the parties agree, state tort duties constitute state labeling requirements. See *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 443–444 (2005); *Riegel* v. *Medtronic, Inc.*, 552 U. S. 312, 323–324 (2008); *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 523–524 (1992) (plurality opinion); *id.*, at 548–549 (Scalia, J., concurring in judgment in part and dissenting in part). Failure-to-warn claims, like Durnell's claim here, "are premised on common-law rules that qualify" as labeling requirements because those "rules set a standard for a product's labeling." *Bates*, 544 U. S., at 446.

That makes good sense. After all, the heart of Durnell's failure-to-warn claim under Missouri tort law is that Monsanto should have included a cancer warning on its Roundup labels.

The question, then, is whether the Missouri failure-to-warn claim—which would require a cancer warning on the Roundup label—would impose a labeling requirement that is "in addition to or different from" federal labeling requirements imposed "under" FIFRA. The answer is yes.

As described at length above, to register a pesticide, EPA must approve the pesticide's label. And to approve the label, EPA must determine that the label contains all warnings "necessary and . . . adequate to protect health and the environment" and that a label does not include any "false or misleading" statements. §§136a(c)(5)(B), 136(q)(1)(A), (G).

After EPA approves a pesticide's label at registration, manufacturers are legally *required* to use that label— unless and until EPA approves or requires a label change and amends the pesticide's registration. See §136a(f)(1); 40 CFR §§152.44(a), 156.70(c) (2025). If a manufacturer does not use the EPA-approved label, it may be subject to civil and criminal penalties. See 7 U. S. C. §§136*l*, 136j(a)(1)(E).

It is true that EPA may subsequently change course in light of new information or new analysis, and require an amended label and amended registration. As described above, FIFRA and EPA's regulations set forth an extensive process for doing so. But absent such an EPA-approved or EPA-required label change, the pesticide manufacturers may—and indeed legally must—use the pesticide label approved by EPA at registration.[5]

---

[5] Of course, a manufacturer may make "minor modifications" by notification to EPA and without EPA's approval. 40 CFR §152.46(a)(1). But EPA's regulations specifically require EPA approval for precautionary "statements pertaining to the hazards of the product," which would include cancer warnings. §156.70(c); see also Brief for United States as *Amicus Curiae* 32–33 ("that exception" for minor modifications "does not apply to precautionary statements like cancer warnings").

The dissent disputes that conclusion, maintaining that precautionary statements encompass only "acute hazards," not chronic risks—and thus do not require EPA approval for cancer warnings. *Post*, at 6, n. 4 (opinion of JACKSON, J.). The ordinary meaning of "hazards" and "precautionary statements," however, covers cancer warnings. Hazards to human health are hazards. As the U. S. Government has explained, "precautionary statements" pertain to the hazards of a pesticide and thus

In sum, federal law requires Monsanto to sell Roundup with the label that EPA approved at the initial registration and that EPA has subsequently re-approved on multiple occasions—that is, the label without a cancer warning. Durnell's state tort claim, by contrast, would require Monsanto to add a cancer warning to its labels. That Missouri-law requirement is "in addition to" and "different from" Monsanto's federal-law labeling obligations.

## B

This Court's precedents reinforce that textual conclusion. In *Bates*, the Court explained that the relevant labeling "requirements" under FIFRA included FIFRA's misbranding provision and "any relevant EPA regulations that give content to FIFRA's misbranding standards." 544 U. S., at 453.

And the *Bates* Court gave a telling example of how FIFRA's preemption clause operates. If an EPA regulation required a "CAUTION" designation for a pesticide and if a state failure-to-warn claim targeted the pesticide's label for including the "CAUTION" designation instead of a

—————

plainly encompass "cancer warning[s]." Brief for United States as *Amicus Curiae* 7 (quotation marks omitted); see Tr. Oral Arg. 55 ("[I]f you are doing something like a hazard warning, which I don't see any way of describing a cancer warning as anything other than that, you must get agency approval. That's what it says. That's 156.70"); see also *id.*, at 43 ("[Section] 156.70 is the clearest. It says, for hazards like cancer, you have to ask for EPA's approval"). That is why EPA requires robust evidence of a pesticide's potential carcinogenicity as a part of registration. See, *e.g.*, 40 CFR §§158.34, 158.130(d)(3), 158.500(d) (2025). And that is why, with respect to Roundup specifically, EPA has repeatedly evaluated glyphosate's potential carcinogenicity to ensure that the pesticide "will not generally cause unreasonable adverse effects" on human health and the environment. 7 U. S. C. §136a(c)(5)(D); see *supra*, at 6–7. Moreover, even if Monsanto could unilaterally add a cancer warning to its Roundup label as a "minor modification," EPA has not required such a warning. Therefore, a state-law requirement purporting to mandate a cancer warning is necessarily "in addition to" or "different from" the relevant federal requirements.

"DANGER" warning, that failure-to-warn claim would be preempted.  See *ibid.*

Here, just like an EPA regulation providing that a pesticide need not include a "DANGER" warning on its label, EPA's registration determination that Roundup's label need not include a cancer warning constitutes a federal labeling requirement that cannot be altered by state law, including state tort suits.  That is because those registration determinations, just like EPA's regulations, "give content to FIFRA's misbranding standards."  *Ibid.*

To be sure, in *Bates*, the state failure-to-warn claims at issue targeted a pesticide label's efficacy claims.  See *id.*, at 435, 440.  Those state tort claims were not preempted. *Bates* distinguished between efficacy claims on the one hand—which EPA did not review as a part of registration— and safety claims on the other hand, which EPA does thoroughly review at registration and are therefore preempted.  See *id.*, at 440 ("EPA's approval of a pesticide label does not reflect any determination on the part of EPA that the pesticide will be efficacious") (quotation marks omitted).

This case of course concerns safety claims.  And when it comes to safety claims, EPA's registration determinations do reflect EPA's considered judgment that a pesticide's label is not false or misleading and contains all necessary warnings.  So safety claims that would impose labeling requirements "in addition to" or "different from" those required under FIFRA are preempted.

The Court's more recent decision in *Riegel* further confirms that Durnell's failure-to-warn claim is expressly preempted.  In *Riegel*, the Court addressed the preemption clause in the Medical Device Amendments of 1976, which is nearly identical to FIFRA's preemption clause.  552 U. S.,

at 316; see 21 U. S. C. §360k(a).[6]   The Medical Device Amendments direct the Food and Drug Administration to approve medical devices for sale after analyzing their safety, just as EPA does for pesticides.  552 U. S., at 318. As part of the premarket approval process, FDA is required to review the device's label and to determine that the label is neither false nor misleading, as EPA does for pesticide labels.  *Ibid.*   And after FDA approves a device, the manufacturer is required to use that label and is prohibited from making any changes to the device or label without additional FDA approval, as is the case with pesticide labels and EPA.  *Id.*, at 319.

The *Riegel* Court concluded that FDA's premarket approval of devices imposed "'requirements' under" the Act's preemption clause, *id.*, at 322, and therefore that FDA's premarket approval of a medical device preempted state-law claims premised on additional or contrary safety requirements.  *Id.*, at 323–325.

*Riegel* is dispositive here.  If FDA's premarket approval of medical devices preempted additional state-law requirements, so too must EPA's registration of pesticides and approval of pesticide labels.

As *Riegel* indicates, allowing Durnell's state tort claim to overcome preemption would affect more than FIFRA.  The Medical Device Amendments and several other federal statutes across a range of industries contain similar or identical labeling preemption provisions.  See, *e.g.*, 21 U. S. C. §§678; 1052(b); 467e; 379s(a), 379r(a)(2); 343–1(a)(2)–(4).   Those similar labeling preemption clauses

_____

[6] The MDA's express preemption clause provides that "no State . . . may establish or continue in effect with respect to a device intended for human use *any requirement*—(1) *which is different from, or in addition to, any requirement applicable under this chapter to the device*, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." 21 U. S. C. §360k(a) (emphasis added).

reflect Congress's judgment that the ability to sell a product throughout the country with a single label can be important to maintaining an efficient nationwide market.

In short, under federal law, Monsanto was required (i) to obtain EPA's approval for its Roundup label at registration; and (ii) to use the EPA-approved Roundup label unless, in the future, EPA approved or required changes to the label. Those are the relevant federal labeling requirements "under" FIFRA. Durnell's failure-to-warn claim, meanwhile, would require Monsanto to place a cancer warning on Roundup's label. That state labeling requirement is "in addition to or different from" EPA's labeling determinations that do not mandate a cancer warning. Durnell's failure-to-warn claim is expressly preempted.[7]

## III

Durnell counters with four overlapping arguments, none of which is persuasive.

*First*, Durnell (echoed by the dissent) contends that a Missouri failure-to-warn claim, like FIFRA itself, simply requires manufacturers to include adequate warnings to protect human health, and not to include false or misleading statements. Compare *Moore* v. *Ford Motor Co.*, 332 S. W. 3d 749, 756 (Mo. 2011), with 7 U. S. C. §§136(q)(1)(A), (G), 136j(a)(1)(E). But that argument operates at far too high a level of generality and disregards the central and comprehensive role that EPA performs in making labeling determinations under FIFRA's registration provisions. Looking at only FIFRA's general standard for misbranding rather than the specific requirements imposed under federal law would nullify

---

[7] Because we conclude that Durnell's failure-to-warn claim is expressly preempted, we need not consider Monsanto's implied preemption argument.

FIFRA's preemption clause and the uniformity that Congress sought for safety warnings on pesticide labels.

Durnell's argument implausibly maintains that EPA's registration and labeling determinations do not have preemptive force. But by its text, FIFRA affords preemptive force to federal requirements imposed "under" FIFRA, not merely those imposed "by" the actual statute itself. §136v(b). And FIFRA authorizes EPA to "prescribe regulations to carry out the provisions of [FIFRA]," and requires EPA to make registration and labeling determinations. §§136w(a)(1), 136a(c)(5)(B). EPA's regulations require manufacturers to use the label approved by EPA, or face potential civil or criminal penalties. See 40 CFR §§152.44(a), 156.70(c) (2025); 7 U. S. C. §§136j(a)(1)(E), 136*l*. So EPA's registration determinations as to the appropriate level of warning on a pesticide's label impose "requirements" "under" FIFRA.

Durnell's argument also contravenes *Riegel* v. *Medtronic, Inc.*, 552 U. S. 312 (2008). There, as explained above, the Court held that FDA's determinations in the premarket approval process imposed federal "'requirements'" "under" the Medical Device Amendments and thereby displaced additional or different state-law requirements imposed through state tort suits. *Id.*, at 322–323. There is no good argument for treating FDA's premarket approval as "requirements" "under" the Medical Device Amendments, but not treating EPA's regulations and registration determinations as requirements under FIFRA's materially identical preemption clause.

*Second*, Durnell claims that EPA's regulations—and its procedures for registering pesticides and approving pesticide labels—exceed or contravene EPA's statutory authority under FIFRA. See Brief for Respondent 21–25, 39–40 (citing *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369 (2024)).

Durnell is incorrect.  Again, FIFRA empowers EPA to "prescribe regulations to carry out the provisions of [FIFRA]."  7 U. S. C. §136w(a)(1).  And FIFRA expressly directs EPA to register pesticides and "determin[e]" that the pesticide's "labeling" complies with FIFRA's many specific requirements.  §136a(c)(5)(B).  During that extensive registration process, EPA critically evaluates the pesticide's label to ensure that the label contains all warnings necessary to protect human health.  After EPA makes a determination about the appropriate warnings for a pesticide's label, a manufacturer is legally required to use that label unless and until EPA subsequently approves or requires a new label.  See 40 CFR §§152.44(a), 156.70(c). Under FIFRA's preemption provision, those federal labeling requirements displace any additional or different state-law requirements.

*Third*, Durnell (also echoed by the dissent) seizes on one of FIFRA's self-described "[m]iscellaneous" provisions, 7 U. S. C. §136a(f)(2), which provides that "[i]n no event shall registration . . . be construed as a defense for the commission of any offense under this subchapter," but that registration is "prima facie" evidence of compliance with the registration provisions.  Durnell argues that the fact of "registration" of a pesticide like Roundup could not serve as a defense to an EPA enforcement action for misbranding and therefore cannot serve as a defense in a state tort suit that parallels a federal misbranding action.

That argument would effectively erase FIFRA's express preemption clause.  And the argument fails for multiple independent reasons.

To begin, §136a(f)(2), by its text, does not apply to state tort suits.  That provision simply clarifies that registration does not bar EPA enforcement actions against manufacturers for violating FIFRA.

Moreover, the premise of Durnell's §136a(f)(2) argument is flawed.  It is highly doubtful that EPA would bring an

enforcement action for misbranding against a manufacturer for using the EPA-approved and EPA-required label. Rather, a manufacturer's label might constitute a misbranding violation if the label (i) included information that was not on the EPA-approved label, or (ii) omitted information that was on the EPA-approved label. Under those circumstances, the mere fact of registration obviously may not serve as a complete defense to an EPA enforcement action, as §136a(f)(2) indicates. In that context, §136a(f)(2) makes complete sense.

But Durnell's failure-to-warn claim does not fault Monsanto for *using* a label different from the EPA-approved labeling. Durnell instead faults Monsanto for *not using* a label different from the EPA-approved label. But FIFRA's preemption clause expressly preempts any state tort claim that would require a pesticide manufacturer to use a label "in addition to" or "different from" federal requirements imposed under FIFRA, which, as explained above, include the EPA-approved label.

And even more problematic for Durnell, EPA regulations promulgated under FIFRA *require* a manufacturer to use the EPA-approved label and prohibit the manufacturer from unilaterally changing the label without EPA's approval. See 40 CFR §§152.44(a), 156.70(c). Indeed, if the manufacturer unilaterally changed the label, as Durnell says Monsanto should have done, the manufacturer would be flouting EPA's regulations and exposing itself to potentially severe federal penalties. See 7 U. S. C. §§136j(a)(1)(E), 136*l*. So Durnell's argument also triggers potential retroactivity and estoppel questions. The law is not ordinarily read to retroactively penalize persons for doing what the Government had required them to do. Cf. *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994).

Not surprisingly, therefore, the United States explicitly represented at oral argument that EPA does not bring a misbranding action when the manufacturer was using an

EPA-approved label.  See Tr. of Oral Arg. 44 ("EPA doesn't go after people for . . . not changing your label even though EPA doesn't let you . . . .  We don't bring that kind of enforcement action").  Instead, as described at length above, if new safety information comes to light, EPA may gather more information from the manufacturer; ask the manufacturer to change its label; pursue registration cancellation, suspension, or modification proceedings; or seek civil or criminal penalties if a manufacturer failed to inform EPA of important new safety-related information.  See 7 U. S. C. §§136a(d), 136d, 136*l*; 40 CFR §152.170(e)(1); Tr. of Oral Arg. 51–52 (United States: "if EPA also thought that there was some sort of misbranding risk," "as a practical matter, what happens is EPA gets information and might ask the manufacturer . . . can you please try to amend your registration and change it?").

But suppose (contrary to the United States' express representation to this Court) that EPA someday did charge a manufacturer with misbranding for using the EPA-approved and EPA-required label.  Even in that unlikely scenario, Durnell's §136a(f)(2) argument would falter in light of the statutory text and context.  To reiterate, §136a(f)(2)'s proviso that registration is not a defense is limited to EPA enforcement actions for "any offense under this subchapter."  And it would be rather bizarre to read a provision entitled "[m]iscellaneous" and dealing only with a defense to an EPA enforcement action to upend FIFRA's carefully calibrated and EPA-centric regulatory scheme. Make no mistake:  Durnell's §136a(f)(2) argument would negate FIFRA's express preemption clause, expose manufacturers to potentially massive tort liability for doing what EPA required them to do, and eviscerate the

"uniformity" of EPA's labeling determinations.  See §§136a(f)(2), 136v(b).[8]

In addition, Durnell's §136a(f)(2) argument does not work for yet another reason.  Monsanto is not invoking the mere fact of "registration" as a complete defense to state tort suits.  Rather, Monsanto is relying on EPA's specific determination that cancer warnings are not required for glyphosate-based pesticide labels.  So even by its own terms, §136a(f)(2) would not apply here.

Last, Durnell's §136a(f)(2) argument contravenes this Court's decision in *Riegel*.  In that case, FDA was statutorily authorized to withdraw premarket approval for a medical device based on "newly reported data or existing information."  552 U. S., at 319.  And FDA was obligated to withdraw approval if it "determine[d] that a device is unsafe or ineffective."  *Id.*, at 319–320.  But the possibility that FDA could withdraw its premarket approval based on new evidence or new analysis did not preclude this Court from concluding that FDA's premarket approval imposed "requirements" on manufacturers that preempted state tort suits under the Medical Device Amendments' materially identical preemption clause.  *Id.*, at 322–323.[9]

––––––––––

[8] Durnell's §136a(f)(2) argument also runs up against the Act's history. Under the initial 1947 Act, manufacturers would apply to register their pesticides with the Secretary of Agriculture, and the Secretary's decision to grant registration was essentially mandatory.  See 61 Stat. 163, 168; *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 437, n. 8 (2005).  At that time, registration did not indicate compliance with the Act.  So §136a(f)(2) is a vestige of that earlier regulatory approach, which is another contextual reason not to interpret it so broadly as to erase FIFRA's later-added preemption clause.

[9] The dissent advances two further arguments for distinguishing *Riegel*.  Neither works.  First, the dissent contends that the Medical Device Amendments lack an equivalent to FIFRA's §136a(f)(2).  See *post*, at 19–20.  But as explained above, premarket approval of a medical device did not prevent the FDA from later withdrawing its approval, just as §136a(f)(2) and other statutory provisions indicate that the mere fact

So too here. The theoretical possibility that EPA could (despite its representation otherwise) try to bring a misbranding enforcement action against a pesticide manufacturer on the theory that the EPA-approved and EPA-required label had in essence become misbranded over time due to new evidence does not deprive EPA's registration decisions of their preemptive force.

*Fourth*, and relatedly, Durnell raises concerns about the scenario in which new safety information arises after EPA's initial registration determination and labeling approval.

As described at length above, however, Durnell's policy concern about regulatory lag is amply addressed by the extensive processes that FIFRA and EPA's implementing regulations have established to respond to new or evolving safety information. For example, manufacturers must apprise EPA of new information "regarding unreasonable adverse effects" of their pesticides. §136d(a)(2). That obligation is backed by civil and criminal penalties. §136*l*.

EPA, meanwhile, also has many ways of ensuring a pesticide's continued compliance with FIFRA. EPA does not sit in an information-free silo. It keeps abreast of new safety developments. EPA may request additional

---

of registration does not foreclose EPA from later changing its labeling requirements.

Second, the dissent points out that *Riegel* did not consider state-law claims that were parallel to "an applicable federal requirement, apart from the FDA's premarket approval process." *Post*, at 20. From that, the dissent concludes that *Riegel* does not control this case, which involves state-law claims that are allegedly parallel to an applicable federal requirement—FIFRA's misbranding prohibition. See *post*, at 20. But that conclusion does not follow. It is true that *Riegel* did not assess whether the state-law claims at issue were "different from, or in addition to" the relevant federal-law requirements. 552 U. S., at 330 (quotation marks omitted). But *Riegel* indisputably did resolve the question of whether premarket approval constituted a "requirement" for preemption purposes. See *id.*, at 322–323. That is the portion of *Riegel* that controls here: It establishes that EPA's analogous registration and label approval determinations are "requirements" under FIFRA.

information from manufacturers whenever the Agency "determines that additional data are required to maintain" a pesticide's registration. §136a(c)(2)(B)(i). And EPA possesses ample resources to evaluate that information. EPA may solicit "comments, evaluations, and recommendations" to "improve the effectiveness and quality" of EPA's "scientific analyses" from scientific advisory panels. §136w(d)(1).

For example, in the aftermath of the International Agency for Research on Cancer's classification of glyphosate as probably carcinogenic, EPA commissioned multiple reports about glyphosate's potential carcinogenicity from its Cancer Assessment Review Committee and Office of Pesticide Programs. See EPA, Office of Chemical Safety and Pollution Prevention, Glyphosate: Report of the Cancer Assessment Review Committee 7–8 (Oct. 1, 2015); EPA, Office of Pesticide Programs, Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential 13 (Dec. 12, 2017).

Moreover, if third parties (like Durnell) want to bring new information to EPA's attention or if they believe that EPA has failed to consider relevant information, those third parties are free to petition EPA to modify, suspend, or cancel a pesticide's registration. See 40 CFR §154.10. And EPA's decision in response to such a petition is subject to judicial review. See 7 U. S. C. §§136n(a), 136d(h).[10]

As demonstrated by that comprehensive regulatory regime, EPA possesses a variety of tools to learn of and address new safety information. And as a matter of law, state tort law may not impose labeling requirements "in

———————

[10] If a citizen becomes aware of new safety concerns that arise after registration, the citizen is free to bring the information to EPA's attention and ask EPA to cancel or suspend the pesticide's registration, or require a labeling change. But that is quite different from seeking to *retroactively* penalize a manufacturer for doing what it was legally required to do at the time.

addition to" or "different from" federal requirements imposed under FIFRA.

\* \* \*

With respect to pesticide labels, FIFRA demands "[u]niformity" and expressly preempts state labeling requirements that are "in addition to" or "different from" federal labeling requirements. §136v(b). Durnell's state-law failure-to-warn claim would require a cancer warning on Roundup's label—a requirement "in addition to" and "different from" the label required by EPA under FIFRA. FIFRA therefore expressly preempts Durnell's claim. We reverse the judgment of the Missouri Court of Appeals and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–1068

_____

## MONSANTO COMPANY, PETITIONER *v.* JOHN L. DURNELL

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
MISSOURI, EASTERN DISTRICT

[June 25, 2026]

JUSTICE THOMAS, concurring.

I agree with the Court's interpretation of the Federal Insecticide, Fungicide, and Rodenticide Act and its application of our preemption precedents. I therefore join its opinion in full. I write separately to call attention to some of the underlying constitutional infirmities in the Act.

First, the Act likely exceeds Congress's authority under the Commerce Clause, which authorizes Congress to regulate "Commerce . . . among the several States." Art. I, §8, cl. 3. This power allows Congress to regulate "selling, buying, and bartering" across state lines. *United States* v. *Lopez*, 514 U. S. 549, 585 (1995) (THOMAS, J., concurring). It does not allow Congress to regulate "agriculture" or "manufacturing," activities entirely "separate" from "commerce." *Id.*, at 586.

The Act is a "comprehensive regulatory statute" that appears to regulate more than the Commerce Clause allows. *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 991 (1984). As this Court has acknowledged, the Act "regulate[s] the use, as well as the sale" of pesticides and "regulate[s] pesticides produced and sold in . . . intrastate . . . commerce." *Id.*, at 991–992. The Act, among other things, requires pesticide manufacturers to register their pesticides with the Environmental Protection Agency, submit information about them, and use EPA-approved labels before selling the

pesticides anywhere. *Ante,* at 2–4. A manufacturer that does not use the approved label may be subject to civil and criminal penalties, regardless of whether the goods are sold in interstate commerce. *Ante*, at 4. And, the Act goes even further, making it illegal for consumers to *use* registered pesticides in ways inconsistent with their label. 7 U. S. C. §§136j(a)(2)(G), 136*l*(b)(2). The Act thereby purports to regulate how an individual who owns pesticide products such as Roundup can use those products, even if he bought them at a locally owned store down the street, and even if he seeks to use them in his own backyard. Accordingly, the Act is likely unconstitutional in many applications.

Second, the Act raises questions about Congress's ability to delegate core legislative power to the EPA. As the Court explains, *ante,* at 3, Congress granted the EPA the authority to issue regulations for carrying out the Act. §136w(a)(1). The EPA has thereby issued "extensive regulations . . . dictating what must appear on a pesticide's label." *Ante,* at 3. Through these label regulations, the EPA exercises immense power over private businesses and individuals. Violating certain regulations is a federal offense. §136j(a)(2)(S). The EPA thus appears to "make substantive rules . . . punishable with fines or imprisonment," a core legislative power that cannot be delegated. *Learning Resources, Inc.* v. *Trump*, 607 U. S. 229, 318 (2026) (THOMAS, J., dissenting).*

––––––––––

*Such delegations of broad regulatory authority often benefit large incumbent companies at the expense of smaller competitors and consumers. Incumbent companies "exercise considerable sway over agency rules," S. Prakash, The Sky Will Not Fall, in The Administrative State Before the Supreme Court 293 (P. Wallison & J. Yoo eds. 2022), which they use to lobby for more "favorable regulations" that "protect the existing regulated firms from threats arising from new firms," T. Sowell, Basic Economics: A Citizen's Guide to the Economy 107–108 (2004). Those regulations often enable a "profitable alliance" between corporations and government, as the corporations look "for government to

Third, and relatedly, the Act raises questions about the extent to which federal agency action can preempt state law, a form of preemption taken for granted by the parties in this case. See Brief for Respondent 37, 39, 43, 49. The Supremacy Clause makes "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties . . . the supreme Law of the Land." Art. VI, cl. 2. The Constitution, federal law, and treaties thus preempt any conflicting state law. See, *e.g.*, *Wyeth* v. *Levine*, 555 U. S. 555, 584–588 (2009) (THOMAS, J., concurring in judgment). Administrative action appears difficult to fit under the Supremacy Clause. Agency action is not the Constitution. Nor is it a treaty. And, "Laws" are made by Congress and the President through bicameralism and presentment. See Art. I, §7, cl. 2. So, if "agency action qualifies as 'supreme Law,'" then it arguably "violates the Constitution's separation of powers." D. Rubenstein, The Paradox of Administrative Preemption, 38 Harv. J. L. & Pub. Pol'y 267, 334 (2015). On the other hand, if agencies cannot make "Law" their actions seem to fall "beyond the Supremacy Clause's purview" and cannot preempt state law. *Ibid.*

Of course, to the extent that federal agency action is treated with the force of law, regulated parties should likely not be compelled by state law to take contradictory actions. See *Wyeth*, 555 U. S., at 588 (opinion of THOMAS, J.) (agreeing that valid federal regulations can preempt conflicting state laws). But, the difficulty illustrates the consequences of the modern administrative state and our mistaken

---

cartelize their industry after private efforts for cartels and monopoly ha[ve] failed." M. Rothbard, The Progressive Era 318 (2017).

This scheme is a perfect example. As the Court explains, EPA approval entails onerous registration requirements, imposing a formidable barrier to entry for any company that, unlike a worldwide chemical conglomerate, lacks the capacity to commission scientific safety and efficacy studies. See *ante,* at 2–6.

separation-of-powers jurisprudence. If agencies were not exercising core legislative power, especially through schemes that exceed even Congress's powers, there would be far less occasion to address conflicts between agency actions and state law that the Constitution's Framers would not have envisioned.

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–1068

_____

## MONSANTO COMPANY, PETITIONER *v.* JOHN L. DURNELL

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
MISSOURI, EASTERN DISTRICT

[June 25, 2026]

JUSTICE JACKSON, with whom JUSTICE GORSUCH joins, dissenting.

In 2019, John Durnell brought a state-law failure-to-warn claim against Monsanto, an agrochemical company that manufactures and distributes a widely used pesticide called Roundup. Durnell claimed that he had developed non-Hodgkin's lymphoma, a type of blood cancer, due to his two-decade-long use of Roundup. Roundup's label did not (and still does not) include any warning about the risk of developing cancer. Durnell thus sued Monsanto in Missouri state court, alleging that Roundup's label lacked a necessary warning. After a 9-day trial, the jury agreed and awarded Durnell $1.25 million in compensatory damages.

Monsanto argues that 7 U. S. C. §136v(b)—a provision of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)—expressly preempts Durnell's failure-to-warn claim. See *ibid.* (providing that state labeling "requirements" that are "in addition to or different from those required under" FIFRA are preempted). Today, the Court agrees. The majority emphasizes that the Environmental Protection Agency (EPA) has consistently registered Roundup—a precondition to Monsanto's ability to sell that product—and has thus approved Roundup's label without a cancer warning. *Ante,* at 6–7. According to the majority, the EPA's registration decision and approval of Roundup's

label created a labeling "requirement" under FIFRA: namely, that Monsanto sell Roundup with the label exactly as the EPA approved it. *Ante,* at 10–11. Thus, the majority concludes, Durnell's lawsuit added a labeling requirement that federal law did not require, triggering preemption per §136v(b). *Ante,* at 11.

In so holding, the Court departs from the near-unanimous view of the many state and federal courts that have rejected this preemption argument.[1] In my view, the majority should have joined that chorus. Durnell's failure-to-warn claim is not "in addition to or different from" FIFRA's mandates; it is *equivalent* to FIFRA's key labeling requirement—the misbranding prohibition. And Durnell's claim does not conflict with any other FIFRA "requirement" for §136v(b) purposes because the EPA's registration of a pesticide and approval of its label does not create a labeling requirement under FIFRA.

So, I respectfully dissent. In accepting Monsanto's argument and holding that Durnell's failure-to-warn claim is preempted, the Court misunderstands FIFRA's requirements, misinterprets the scope of FIFRA's preemption, and ultimately leaves Durnell without a remedy for the significant harms he has suffered.

I

Congress has the power to preempt state law. It can do so expressly through the text of a federal statute or impliedly. Regardless of the method, federal preemption is

---

[1] See, *e.g.*, 707 S. W. 3d 828, 835 (Mo. App. 2025) (case below); *Carson* v. *Monsanto Co.*, 92 F. 4th 980, 986 (CA11 2024); *Hardeman* v. *Monsanto Co.*, 997 F. 3d 941, 954 (CA9 2021); *Anderson* v. *Monsanto Co.*, 719 S. W. 3d 755, 798 (Mo. App. 2025); *Caranci* v. *Monsanto Co.*, 338 A. 3d 151, 170 (Pa. Super. 2025); *Dennis* v. *Monsanto Co.*, 116 Cal. App. 5th 322, 342, 339 Cal. Rptr. 175, 188 (2025); *Johnson* v. *Monsanto Co.*, 333 Ore. App. 678, 699–701, 554 P. 3d 290, 306–308 (2024); *Pilliod* v. *Monsanto Co.*, 67 Cal. App. 5th 591, 613, 282 Cal. Rptr. 3d 679, 698 (2021); but see *Schaffner* v. *Monsanto Corp.*, 113 F. 4th 364, 399 (CA3 2024).

typically premised on a conflict between federal and state law. See *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. 453, 477 (2018). Under the Constitution's Supremacy Clause, Art. VI, cl. 2, "federal law takes precedence" over conflicting state law "and [thus] the state law is preempted." *Murphy*, 584 U. S., at 477.

Importantly, however, there is not always a complete conflict between a federal statute and state law, even if they address the same subject matter. That is, federal law does not necessarily box out *all* state regulation on a particular issue. Congress can and does enact statutory provisions that specifically define the preemptive scope of the federal law. See, *e.g.*, *Montgomery* v. *Caribe Transport II, LLC*, 608 U. S. \_\_\_, \_\_\_–\_\_\_ (2026) (slip op., at 2–3) (describing preemption provision that carves out state safety regulations); cf. *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted"). And federal preemption provisions often permit *parallel* state laws—*i.e.*, those that "merely duplicate federal requirements." *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 442, 453 (2005). When allowing state-law versions of a federal mandate, Congress displaces state law only "to the extent of th[e] difference" from federal law. *Id.*, at 453. Thus, state law can still "provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 495 (1996).

FIFRA fits this mold. It is a federal statute that regulates the sale and use of pesticides, and among other things, requires that pesticides bear detailed labels providing consumers with information about how to use them and what risks they pose. FIFRA expressly limits States' authority to regulate pesticide labels, but it does not eliminate that authority. Instead, FIFRA preempts only those state "requirements for labeling or packaging in addition to or

different from" the requirements under FIFRA. §136v(b).[2] This means that state labeling requirements "equivalent to" FIFRA's requirements are not preempted. *Bates*, 544 U. S., at 447. In other words, FIFRA's preemption clause does not block state-law claims where the violation of state law is also a violation of FIFRA. *Id.*, at 454.

## II

To analyze the reach of FIFRA's preemption provision, I begin, per usual, with the statute's text. See *Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. 582, 594 (2011). To repeat: §136v(b) provides that a "State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under" FIFRA. To distinguish the state laws this provision preempts from those that can continue unabated, one must, first, identify the "requirements" under FIFRA, and, second, determine whether the state law imposes requirements that are "in addition to or different from" (as opposed to the equivalent of) those FIFRA requirements.

Here, the majority falters on both tasks. FIFRA's labeling requirements are established by statute and regulation, and those requirements are no different than the labeling duties imposed by Missouri via its failure-to-warn tort. The state-law claim at issue reflects a parallel requirement that is fully consistent with FIFRA's primary labeling duty—its misbranding prohibition—and makes no additional asks of those who are subject to it.

## A

"A requirement is a rule of law that must be obeyed." *Bates*, 544 U. S., at 445. In interpreting FIFRA, this Court has previously held that the term "requirements" includes "positive enactments, such as statutes and

--------

[2] As the majority points out, many federal statutes contain similarly limited express preemption clauses. *Ante,* at 13–14 (collecting statutes).

regulations," as well as "common-law duties." *Id.*, at 443. Thus, the "requirements" under FIFRA that can preempt state labeling requirements are those directives "set out in FIFRA and its implementing regulations." *Id.*, at 452.

FIFRA's principal labeling requirement is its prohibition on selling or distributing "misbranded" pesticides. §136j(a)(1)(E). The statutory definition of "misbranded" is extensive, establishing many detailed supplementary labeling requirements. See §136(q). For example, a pesticide that contains a highly toxic substance but does not have the "skull and crossbones" and the word "'poison'" on its label is misbranded. §136(q)(2)(D). So too is a pesticide that does not bear an ingredient statement. §136(q)(2)(A). And so is a pesticide that has "false or misleading" statements on its label. §136(q)(1)(A).

Another type of prohibited misbranding is relevant to today's dispute: A pesticide is misbranded if "the label does not contain a warning or caution statement which may be necessary and . . . is adequate to protect health and the environment." §136(q)(1)(G). Adequate warnings must, among other things, protect against "any unreasonable risk to [humans] or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." §136(bb); see §136(x). Consequently—and this is important to remember—one requirement under FIFRA is that a pesticide's label must contain "adequate" and "necessary" warnings. §136(q)(1)(G).

FIFRA does not specify the particular warnings that are adequate and necessary (and thus comply with the misbranding prohibition). But the EPA has started to fill in that gap by promulgating regulations to "give content to" FIFRA's misbranding prohibition in certain contexts. *Bates*, 544 U. S., at 453. For the adequate-and-necessary-warnings requirement, EPA regulations require labels to contain specific precautionary statements in a certain circumstance: where the pesticide may cause particularly

acute hazards.   See 40 CFR §§156.60–156.70 (2025); see also §156.10(a)(1)(vii).  The regulations dictate that, for certain categories of toxins, a pesticide manufacturer must add to the product label different "signal word[s]": "'DANGER,'" "'WARNING,'" and "'CAUTION.'"  §156.64.

To date, the EPA has not promulgated any other regulations pertaining to FIFRA's adequate-and-necessary-warning requirement.[3]   Critically for present purposes, the EPA's regulations do not set specific requirements for label warnings relating to *chronic* risks, like cancer.[4]  FIFRA's misbranding prohibition establishes the broad requirement that a pesticide's label contain necessary and adequate warnings for any chronic risks, but neither the statute nor

––––––––––

[3] The EPA *has* promulgated regulations that give content to a different aspect of FIFRA's misbranding prohibition: the false-or-misleading-statement element.  Those regulations provide a nonexhaustive list of statements that qualify as false or misleading and therefore would render the pesticide misbranded.  See 40 CFR §156.10(a)(5) (2025) (prohibiting, for example, "[c]laims as to the safety of the pesticide" such as "'safe'" or "'nontoxic to humans and pets'").

[4] The majority asserts that cancer warnings are a type of precautionary statement covered by the EPA's regulations, relying on its unsupported view of the "ordinary meaning of 'hazards' and 'precautionary statements.'"  *Ante,* at 10–11, n. 5.  That is mistaken.  Whatever the ordinary meaning of the term (and whatever the United States' litigation-created interpretation), the "[p]recautionary statements" regulations are expressly directed at only acute hazards.  §156.70.  The regulations require that, if the pesticide may pose "an *acute* hazard" to "humans or domestic animals," then the pesticide's label "must bear precautionary statements describing the particular hazard."  §156.70(b) (emphasis added).  The regulations then list the "typical hazard and precautionary statements": warnings that the pesticide is or may be "[f]atal" or "[h]armful" if swallowed or that it could cause eye or skin irritation.  §156.70(c).  The risk of developing cancer is not listed as an "acute" hazard.  Nor could it be; cancer is a long-term or chronic risk.  While the EPA does, as part of its registration decision, evaluate the chronic risks a pesticide may pose, see *ante,* at 11, n. 5, the EPA has not promulgated regulations addressing when a cancer warning must be included on a label or what a cancer warning must say.  The precautionary-statements regulations simply have nothing to do with cancer warnings.

the EPA's regulations dictate more specific requirements for such warnings.

### B

All this has implications for the meaning of FIFRA's preemption provision. The provision's language establishes that when FIFRA itself or the EPA's regulations require specific statements on a pesticide's label—such as the skull and crossbones or a particular "signal word"—a state law that requires additional or different statements is preempted. But, absent such federal-law requirements, a state-law duty that simply parallels FIFRA's misbranding prohibition is not preempted.

Suppose, for example, a State mandates that pesticides causing moderate skin irritation bear the word "WARNING." That state law would be preempted by FIFRA because the EPA's regulations require that the label for pesticides causing moderate skin irritation bear the signal word "CAUTION." 40 CFR §§156.62, 156.64(a)(3). The State's labeling requirement is different from (and indeed conflicts with) the EPA's regulations. By contrast, if a State seeks to hold a manufacturer liable under state law for failing to label a pesticide with the *same* warning words that federal regulations require, application of the state law would *not* be preempted under 7 U. S. C. §136v(b). In that situation, the State is not requiring anything "in addition to or different from" FIFRA's requirements.

Consider another example. A State wants to ensure that the pesticides its residents use are properly labeled and contain all warnings necessary and adequate to protect against unreasonable risks to its residents and the environment. So it either enacts a statute that makes liable any pesticide manufacturer that fails to provide adequate and necessary warnings, or relies on the existing tort regime to accomplish this same result. In either case, the state-law scheme merely "duplicate[s]" FIFRA's adequate-and-

necessary-warnings requirement—and is therefore not preempted. *Bates*, 544 U. S., at 442. Why not? Because the State is not requiring anything "in addition to or different from" what FIFRA's own misbranding prohibition requires.

With that background, it is easy to see that Durnell's failure-to-warn claim—which faults Monsanto for not including cancer warnings on the Roundup label—does not trigger preemption under FIFRA. Missouri's failure-to-warn tort punishes the sale of unreasonably dangerous products, like pesticides, without "adequate warning of the danger." *Moore* v. *Ford Motor Co.*, 332 S. W. 3d 749, 756 (Mo. 2011) (en banc). As the Missouri Court of Appeals explained, Durnell's claim has the same "practical effect" as FIFRA's misbranding prohibition: "[B]oth require a pesticide manufacturer to adequately warn users of the potential dangers of using its product." 707 S. W. 3d 828, 833 (2025) (internal quotation marks omitted). Durnell's claim does not impose any labeling requirement that is "in addition to or different from" what FIFRA itself requires, §136v(b); instead, the standards prescribed by federal and state law are equivalent.[5]

───────────

[5] To be clear, Missouri's failure-to-warn claim is equivalent to FIFRA's misbranding prohibition at least as presented to us. Monsanto argues that Missouri's tort is not equivalent because it permits, but does not require, a jury to conduct the cost-benefit analysis that FIFRA's adequate-and-necessary-warnings requirement appears to mandate. See *Rodriguez* v. *Suzuki Motor Corp.*, 996 S. W. 2d 47, 65 (Mo. 1999) (en banc) (leaving the decision of what it means to be "unreasonably dangerous" to the jury (internal quotation marks omitted)); 7 U. S. C. §136(bb) (incorporating the "costs and benefits of the use of any pesticide" into the definition of "misbranded").

But any potential difference does not doom Durnell's claim. Recall that preemption displaces state law only "to the extent of th[e] difference" between state and federal law. *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 453 (2005). Monsanto has not properly presented any argument that Durnell's claim *in fact* imposes a requirement that differs from

Why might a federal law that expressly seeks "[u]niformity" in labeling, §136v(b), leave room for parallel state tort suits like Durnell's? As we have previously explained, "FIFRA contemplates that pesticide labels will evolve over time." *Bates*, 544 U. S., at 451. To that end, "tort suits can serve as a catalyst"—encouraging pesticide manufacturers to "keep abreast of all possible injuries stemming from use of their product" and to maintain labels with the necessary and adequate warnings. *Ibid.* (internal quotation marks omitted). Parallel state tort liability is an enforcement tool that can have a salutary information-forcing effect, and that, in turn, helps ensure the effectiveness of FIFRA's misbranding prohibition.

### III

The majority does not view FIFRA's misbranding prohibition as the relevant federal "requirement" for preemption purposes. Instead, it ventures far beyond FIFRA and its regulations, purporting to identify the relevant labeling requirement in the EPA's approval of Roundup's label. *Ante,* at 10–11, 14. The argument goes like this: A manufacturer must register its pesticide with the EPA before selling or distributing it. §136a(a). As part of the registration

---

FIFRA's misbranding prohibition. Monsanto did not seek a jury instruction at trial directing the jury to find for Durnell only if his evidence met the requirements for FIFRA's misbranding standard. See *id.*, at 454. Since it declined to present that argument to the jury, Monsanto cannot now complain that Durnell's claim is actually broader than the federal requirement. Nor does Monsanto argue before us that the evidence at trial was insufficient to support a jury verdict for a failure-to-warn claim that was equivalent to FIFRA's misbranding standard. Cf. *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 513 (1988) (holding that a plaintiff would not be entitled to a new trial, even after the Court of Appeals reformulated the relevant defense, "[i]f the evidence presented in the first trial [still] would not suffice . . . to support a jury verdict under the properly formulated defense"). Accordingly, we cannot address whether Durnell's failure-to-warn claim, in light of the evidence presented, is different than FIFRA's misbranding standard.

process, the EPA reviews and approves the pesticide's label, confirming that the label complies with FIFRA's requirements. §136a(c)(5)(B). Furthermore, the EPA generally requires a manufacturer to get the agency's approval before changing its product's label. 40 CFR §152.44.

As the majority sees it, the EPA's registration of a pesticide and approval of its label creates a federal requirement that the manufacturer use the label exactly as the EPA approved it. *Ante,* at 11. Here, the majority says, because the EPA approved Roundup's label without a cancer warning, state law cannot require Roundup's label to include one. *Ante,* at 11, 14.

This theory has some intuitive appeal—federal approval should count for something, after all. But, in reality, the majority's view is unmoored from the statute's text and irreconcilable with our precedents.

### A
### 1

Start with the text. In the same section of FIFRA that lays out the pesticide registration process, the statute contains a crucial caveat: "In no event shall registration of [a pesticide] be construed as a defense for the commission of any offense under" FIFRA, 7 U. S. C. §136a(f)(2)—including misbranding, §136j(a)(1)(E). Rather, per the terms of the statute, registration is merely "prima facie evidence that the pesticide [and] its labeling . . . comply with the registration provisions of" FIFRA. §136a(f)(2).

These two parts of §136a(f)(2) work in tandem. Registration is prima facie evidence that the pesticide's label complies with FIFRA's requirements, meaning that the EPA's approval reflects the agency's best judgment that the label satisfies FIFRA. See §136a(c)(5)(B). But prima facie evidence is not conclusive evidence. Thus, the statute clarifies that, in the face of a misbranding charge, the EPA's registration is not a defense. This means that the EPA's

approval of a pesticide's label cannot conclusively establish that the pesticide is not misbranded. The statute, in other words, does not treat as infallible the EPA's judgment as to whether FIFRA's misbranding provision has been violated. For that reason, a pesticide may be "registered but nevertheless misbranded." *Bates*, 544 U. S., at 438.

This, in turn, must mean that the EPA's (not infallible) approval of a pesticide's label does not establish a "rule of law that must be obeyed" when it comes to the pesticide's label. *Id.*, at 445. Because the EPA's registration decision is not conclusive of the label's compliance with the statute, that registration decision itself cannot carry the force of law, much less capture the universe of requirements with which a manufacturer must comply to prevent its product from being misbranded in violation of FIFRA. To conclude otherwise would turn the registration decision from "prima facie evidence" of compliance with FIFRA into conclusive proof of such compliance. It defies logic to treat the EPA's approval of a pesticide's label as creating a legal requirement under FIFRA when that approved label may not comply with the law.

The majority fails to grapple with any of this. Nor does it address the internal tension its theory produces. The majority says that the registration process creates a requirement because a pesticide manufacturer must use the label exactly as the EPA approved it, with no additions or changes. But the statutory misbranding prohibition might well require a different or additional warning on the label than what the EPA approved, since approval is merely prima facie evidence of compliance. The majority's theory thus cannot be squared with what FIFRA plainly requires. That is, notwithstanding the EPA's approval of its label, a manufacturer has "a continuing obligation to adhere to FIFRA's labeling requirements," including the misbranding prohibition. *Id.*, at 438.

In short, the EPA's approval of the label cannot set a "requirement" for §136v(b) purposes. Instead, the requirements of FIFRA—the misbranding prohibition and the implementing regulations—dictate the contents of the label. This is so because §136a(f)(2) makes clear that FIFRA's misbranding prohibition *continues to apply* to pesticides even after they have been registered. The upshot here is that, even though the EPA approved Roundup's label, that label could still lack a necessary warning.

A real-world example illustrates the interplay between registration and misbranding. In 1999, the EPA approved a label for a Roundup product distributed by Monsanto that did not include any statements warning the user that the pesticide could leak.[6] But the EPA itself soon determined that the approved label did not meet the requirements of FIFRA because, "[w]hen used in accordance with its label directions," the pesticide could "leak or spray onto the user." *In re: The Monsanto Co.*, 2000 WL 1886918, *2 (EAB, Sept. 29, 2000). Accordingly, the EPA imposed civil penalties on Monsanto for "distributing or selling misbranded pesticides." *Ibid.*

This example rebuts the majority's claim that a registered pesticide can be misbranded only if the label contains information that was not on the label that the EPA approved or omits information that was. *Ante,* at 16–17. Far from creating a new requirement under FIFRA, the EPA's approval of the label did *not* suffice to establish compliance with the statutory requirement that a pesticide not be misbranded, nor did it shield Monsanto from liability for

---

[6] See Roundup® L & G READY-TO-USE Fast Acting Formula Grass & Weed Killer, EPA Reg. No. 239–2638, pp. 11–12 (June 8, 1999), https:// www3.epa.gov/pesticides/chem_search/ppls/071995-00008-19990608.pdf (archived at https://perma.cc/7EkZ-SPFW).

violating the misbranding requirement.[7] And if a state-tort duty, akin to Durnell's failure-to-warn claim, had likewise required Monsanto to include a leak warning on the label, the State's requirement would have been identical to FIFRA's and therefore would not have been preempted—regardless of the fact that the EPA had previously approved the label without that warning.

The continuing force of FIFRA's misbranding prohibition, even after the EPA's registration of a pesticide, thus resolves today's preemption dispute. Since FIFRA's misbranding prohibition remains a requirement with which registered pesticides must comply, state-law duties that are equivalent to the misbranding prohibition add nothing new or different that would trigger preemption. If an additional warning is necessary to comply with FIFRA's misbranding prohibition, then a state-law duty can require that warning, even if the EPA approved the label without it.

2

The majority tries valiantly to discount the relevance of §136a(f)(2)—the provision clarifying that the EPA's registration decision is not conclusive of a pesticide manufacturer's compliance with FIFRA's misbranding prohibition. Its efforts fail.

––––––––––

[7] For a similar example, see *In re: Ecolab Inc.*, 2009 WL 10729367 (EPA, June 22, 2009) (imposing civil penalties for misbranding on manufacturer whose three pesticides were ineffective against certain bacteria even though the EPA-approved labels stated that the pesticides were effective against those bacteria). See also A–33, EPA Reg. No. 42964–5, pp. 2, 4 (Aug. 24, 2004), https://www3.epa.gov/pesticides/chem_search/ppls/042964-00005-20040824.pdf (archived at https://perma.cc/2JPG-NXYA) (first label); A–33 Dry, EPA Reg. No. 42964–25, p. 3 (May 17, 2002), https://www3.epa.gov/pesticides/chem_search/ppls/042964-00025-20050517 (archived at https://perma.cc/T6LJ-ZUZB) (second label); Omega, EPA Reg. No. 42964–14, p. 2 (May 24, 2001), https://www3.epa.gov/pesticides/chem_search/ppls/042964-00014-20010524.pdf (archived at https://perma.cc/27XH-WMJZ) (third label).

The majority notes, for example, that §136a(f)(2) is in the portion of the registration statute titled "[m]iscellaneous," and reasons that "it would be rather bizarre" for a miscellaneous provision to "upend" the statute's preemption provision. *Ante,* at 18. But the policy concern about exposing manufacturers to disruptive tort liability is no basis for ignoring the statute's text. And the argument is also substantively faulty. It assumes the conclusion that the EPA's approval of a label creates a "requirement" with preemptive force (hence the bizarreness of housing this consequential provision in a "miscellaneous" section of the statute). Under a correct interpretation of §136a(f)(2), however, the EPA's approval of the label does not create requirements. So registration does not preempt different or additional state-law requirements, §136a(f)(2) does not upend anything, and the "miscellaneous" placement of this provision makes sense.

The majority also tries to cast doubt on §136a(f)(2)'s relevance to the preemption provision. In particular, the majority argues that §136a(f)(2) does not apply to state tort lawsuits as a general matter, and that it would not apply here because Monsanto did not invoke the fact of registration as a defense to Durnell's claim. *Ante,* at 16, 19. But this framing misses the point. Section 136a(f)(2)'s relevance to the preemption question is not whether Monsanto intends to, or can, invoke registration as a defense to Durnell's failure-to-warn suit. Instead, §136a(f)(2) clarifies that a "no misbranding" conclusion cannot be based on the fact of registration alone, thus demonstrating that registration itself does not create a labeling requirement under FIFRA—in any context.

In addition to its attempt to downplay §136a(f)(2), the majority also insists that the EPA's registration of a pesticide must create a labeling requirement because the manufacturer cannot change its pesticide's label without the EPA's approval, on pain of civil or criminal penalties. *Ante,*

at 10, 15, 17. But the majority's analysis—which errone-
ously treats the EPA-approved label as a requirement un-
der FIFRA—misstates FIFRA and the EPA's implementing
regulations, and it also misunderstands the nature of
FIFRA's express preemption clause.

First of all, it is wrong to say that FIFRA establishes that
a manufacturer can face civil or criminal penalties solely for
using a label that differs from what the EPA approved. The
closest FIFRA comes to this is the provision that makes it
unlawful for any person to "alter . . . any labeling required
under" FIFRA. §136j(a)(2)(A). Notably, this provision does
not say that it is unlawful to alter the label that *the EPA*
approved. Instead, it protects only the "labeling required
under" FIFRA. And given §136a(f)(2), we know that the
EPA-approved label is not coextensive with the "labeling re-
quired under" FIFRA because FIFRA's ongoing misbrand-
ing prohibition could require that the EPA-approved label
be amended.

Another variation of this argument is the majority's con-
tention that it is a violation of FIFRA's misbranding provi-
sion "if a manufacturer sells its pesticide with a different
label than the one [the] EPA approved." *Ante,* at 4. The
majority offers no support for this assertion—and there is
none. The statutory definition of misbranding does not say
that a pesticide sold with a label different from the EPA-
approved label is necessarily misbranded. See generally
§136(q).

Second, the fact that a pesticide manufacturer must seek
the EPA's approval for most labeling changes does not
change the express preemption calculus. Whatever the
manufacturer must do procedurally to get its product ap-
proved for marketing, FIFRA requires the manufacturer
not to sell a misbranded pesticide. The majority implicitly
acknowledges this when it notes that the EPA can require
changes to a pesticide's label in light of new information or
analysis. *Ante,* at 10. The agency mandates such changes

to ensure continued compliance with FIFRA's require-
ments, including the misbranding prohibition.    See
§136d(b) (providing that the EPA can cancel a pesticide's
registration or change its classification "[i]f it appears to the
Administrator that a pesticide or its labeling . . . does not
comply with" FIFRA); §136d(d) (authorizing the EPA Ad-
ministrator to "requir[e] modification of the labeling").  So
FIFRA's misbranding prohibition continues to apply to reg-
istered pesticides.  And state-law requirements that paral-
lel FIFRA's misbranding prohibition add nothing new.
Therefore, such state-law requirements can likewise apply
to registered pesticides.

   At the end of the day, then, the majority's theory of ex-
press preemption rests on a misinterpretation of FIFRA.
The EPA's approval of a pesticide's label does not create a
labeling requirement under FIFRA.  Instead, FIFRA's key
labeling requirement—the statutory prohibition on mis-
branding—continues to apply to registered pesticides even
though the EPA has approved their labels.    State-law
claims that parallel the misbranding prohibition are not
preempted, even if the claim requires a warning that was
absent from the EPA-approved label.  The majority thinks
it "implausibl[e]" that the "EPA's registration and labeling
determinations do not have preemptive force." *Ante,* at 15.
But, at bottom, the majority's quibble is with the text of
FIFRA's misbranding requirement and preemption provi-
sion, not with Durnell's claim.

### B

   Perhaps recognizing all this, Monsanto embraces a more
extreme position: that a registered pesticide can never be
misbranded. Tr. of Oral Arg. 10–11.  That argument is eas-
ily disposed of because it cannot be squared with our deci-
sion in *Bates*, 544 U. S. 431, which recognized that a pesti-
cide can be "registered but nevertheless misbranded," *id.*,
at 438.  Indeed, *Bates*—the only prior case in which we

interpreted FIFRA's preemption provision—not only requires flat rejection of this view; it also confirms that the majority's interpretation of §136v(b) is wrong.

The plaintiffs in *Bates* brought state tort claims against Dow Agrosciences for failing to warn them that the use of its pesticide in a particular type of soil would stunt crop growth. *Id.*, at 435. We held that States could impose label-based requirements that were equivalent to FIFRA's misbranding prohibition. *Id.*, at 452–453. And we remanded for the lower courts to decide in the first instance whether the particular failure-to-warn claim at issue in *Bates* imposed a requirement equivalent to FIFRA's misbranding prohibition. *Id.*, at 453–454.

That disposition is critical. Had *Bates* accepted the theory the majority adopts today, there would have been no need to remand the case. That is, if the EPA's approval of a label preempted States from requiring any different or additional warnings, then a failure-to-warn claim would be impossible. Our remand in *Bates* thus necessarily rejected the theory that the EPA's approval of the label creates a labeling requirement that can preempt a state failure-to-warn claim.

The majority tries unsuccessfully to rewrite *Bates* to support its view. It focuses principally on an example *Bates* gave of the type of EPA regulation that could preempt a failure-to-warn claim: the precautionary-statements regulations that require a "CAUTION" designation or a "DANGER" designation depending on the pesticide's toxicity. *Ante,* at 11–12 (citing *Bates*, 544 U. S., at 453). The EPA's registration determination, the majority says, is "just like" those EPA regulations. *Ante,* at 12.

But the majority provides no justification for this comparison. For good reason: It is only the EPA's duly promulgated regulations that can prescribe the content of a pesticide's label, not the individualized registration decision. Indeed, *Bates* made clear that the EPA's registration

decision and the regulation providing for certain designa-
tions are *not* alike. *Bates* explained that the relevant fed-
eral requirements could be found in FIFRA's misbranding
prohibition and "any relevant EPA regulations that give
content" to the misbranding standards. 544 U. S., at 453.
*Bates* also noted that "there appear to be relatively few reg-
ulations that refine or elaborate upon FIFRA's broadly
phrased misbranding standards." *Ibid.*, n. 28. Thus, *Bates*
gave no suggestion that the EPA's registration of a particu-
lar pesticide (and corresponding approval of its label) also
created requirements under FIFRA.

Nor could it. Because registration of a pesticide is not
conclusive of FIFRA compliance, the registration decision
cannot give content to FIFRA's misbranding standard. In-
stead, *Bates*'s reference to the EPA regulations means just
that—the regulations that the EPA promulgated pursuant
to its statutory authority. See §136w(a).

The majority also points out that the *Bates* plaintiffs'
failure-to-warn claim concerned a pesticide's lack of effi-
cacy, while Durnell's claim here relates to the pesticide's
safety. *Ante,* at 12; see also Brief for Petitioner 31–34. That
matters to *Bates*'s outcome, the majority says, because the
EPA had not reviewed the pesticide's efficacy as part of the
registration process, so the EPA-approved label would of
course not preempt state-required statements related to ef-
ficacy. See §136a(c)(5).

The problem with this argument is that it is irrelevant to
our actual holding in *Bates*. Our decision did not rely on
the fact that the EPA had waived review of the pesticide's
efficacy in its registration determination. Indeed, outside
of our discussion of the case's factual background, we men-
tioned the agency's decision to waive efficacy review only
once: when explaining why it was particularly important to
allow tort litigation in those circumstances. 544 U. S., at
450. But this was in the context of discussing an alterna-
tive ground for our holding, namely, applying a

presumption against preemption. *Id.*, at 449–450. It was not support for our primary holding, grounded in the text of the statute, that FIFRA does not preempt state tort claims that parallel its requirements.[8]

Instead of relying on our precedent about FIFRA, the majority points to our decision in *Riegel* v. *Medtronic, Inc.*, 552 U. S. 312 (2008). See *ante,* at 12–13. *Riegel* involved an entirely separate statute: the Medical Device Amendments of 1976 (MDA). Similar to FIFRA, the MDA established a premarket registration scheme for medical devices that included review and approval of the devices' labeling by the Food and Drug Administration (FDA). 21 U. S. C. §360e(d)(1)(A). The MDA also has an express preemption provision similar to FIFRA's. Specifically, the MDA preempts state requirements "with respect to a device intended for human use" that are "different from, or in addition to, any requirement applicable under [the MDA] to the device." §360k(a). We held in *Riegel* that "[p]remarket approval . . . imposes 'requirements'" specific to medical devices under the MDA. 552 U. S., at 322–323. So, the majority says, if premarket approval under the MDA creates labeling requirements, then the EPA's registration and approval of pesticide labels under FIFRA does too. *Ante,* at 13–14.

But in treating *Riegel* as dispositive, the majority ignores a key difference between the MDA and FIFRA: The MDA has nothing analogous to 7 U. S. C. §136a(f)(2). This matters because, again, §136a(f)(2) establishes that the EPA's

_____

[8] Confirming the irrelevance of the EPA's waiver of efficacy review to our holding in *Bates*, we granted, vacated, and remanded—in light of *Bates*—a case holding that FIFRA preempted a *safety*-based failure-to-warn claim. *Oken* v. *Monsanto Co.*, 544 U. S. 1012 (2005); see *Oken* v. *Monsanto Co.*, 371 F. 3d 1312, 1314–1315 (CA11 2004) (*per curiam*). Had *Bates* concluded that the EPA's approval of a label did not preempt a failure-to-warn claim only because the EPA did not review the label's statements related to efficacy, vacating and remanding a safety-based case would have been unnecessary.

approval of a pesticide's label is not conclusive of the label's compliance with FIFRA and therefore cannot establish a requirement under FIFRA. Because the MDA lacks an analogous provision, it might well be that the FDA's approval of a medical device's label *does* create labeling requirements under the MDA.[9]

There is another reason that the right outcome in today's case differs from *Riegel*: *Riegel* did not involve "parallel claims." 552 U. S., at 330. The litigation in *Riegel* proceeded on the assumption that the medical device "violated state tort law notwithstanding compliance with the relevant federal requirements." *Ibid.* So this Court had no occasion to consider whether there was an applicable federal requirement, apart from the FDA's premarket approval process, that might be equivalent to the plaintiffs' tort claim. Here, by contrast, it is precisely because FIFRA's misbranding prohibition parallels Missouri's failure-to-warn claim that Durnell's claim is not preempted.

Thus, it is *Bates*, not *Riegel*, that is dispositive here. Contra, *ante,* at 13. *Bates* confirms what FIFRA's text makes clear: The EPA's approval of a label does not create a requirement under FIFRA.

## IV

Having rejected Monsanto's express preemption argument, I conclude by addressing its alternative contention that Durnell's failure-to-warn claim is impliedly

---

[9] The majority tries to wave away the MDA's lack of a provision analogous to §136a(f)(2), arguing that, in any event, the FDA could withdraw premarket approval from a medical device that it had previously approved. *Ante,* at 19–20, n. 9. But the statutory caveat in §136a(f)(2) is broader than the FDA's withdrawal authority in the MDA. Specifically, §136a(f)(2) makes clear that registration does not preclude a pesticide from being misbranded—regardless of *who* makes the misbranding determination. By contrast, the MDA gives authority *only* to the FDA to withdraw premarket approval from a medical device if it determines that device is misbranded. 21 U. S. C. §360e(e)(1)(F); see §352(a).

preempted. Specifically, Monsanto argues that it is impossible to comply with both the labeling requirements of Missouri law and the labeling requirements of FIFRA. See *Mutual Pharmaceutical Co.* v. *Bartlett*, 570 U. S. 472, 480 (2013).

Monsanto is wrong. It can easily comply with both federal and state law by stopping sales of Roundup. Under FIFRA, it is unlawful to sell a misbranded pesticide. §136j(a)(1)(E). Under Missouri failure-to-warn law, manufacturers have a duty not to sell products made unreasonably dangerous by inadequate warnings. See *Racer* v. *Utterman*, 629 S. W. 2d 387, 395 (Mo. App. 1981). Far from being incompatible, both federal and state law *require* Monsanto to stop selling its pesticide if the label lacks adequate warnings.

To be sure, our decision in *Bartlett* largely rejected a "stop-selling rationale" as "incompatible with our preemption jurisprudence." 570 U. S., at 488 (internal quotation marks omitted). But we also expressly left open the possibility that a manufacturer could avoid state and federal liability if the state claim "parallel[ed] the federal misbranding statute" at issue in that case. *Id.*, at 487, n. 4. This was because the relevant misbranding statute could require the manufacturer to pull the product from the market. *Ibid.* As support for this conclusion, we cited *Bates*, implying that we were not deciding whether a "stop-selling rationale" would (or would not) work to avoid implied preemption where the federal and state standards are equivalent and impose a duty not to sell misbranded products. This case thus falls squarely into the exception seemingly left open by *Bartlett*.

In any event, Monsanto's implied preemption argument fails on its own terms. The premise of Monsanto's contention is that Missouri law requires it to add a cancer warning, but FIFRA prohibits Monsanto from adding such a

warning without approval from the EPA. Monsanto says it thus cannot do under federal law what state law requires.

But Monsanto overstates the difficulty of adding a cancer warning to Roundup's label. In *PLIVA, Inc.* v. *Mensing*, 564 U. S. 604 (2011), we explained how true impossibility works in the labeling context. There, a plaintiff alleged that a generic drug manufacturer had failed to include adequate warnings on its label. *Id.*, at 610. Federal law, however, required the label on a generic drug to match exactly the label on the brand-name drug. *Id.*, at 612–613. So, for a generic manufacturer to add a warning, it would have to ask the FDA to ask the brand-name manufacturer to add the warning. *Id.*, at 616. We explained that the state-law claim was preempted because it was impossible for the generic manufacturer to add the required warning without the "special permission and assistance" of the Government. *Id.*, at 623–624.

Here, by contrast, Monsanto does not need the EPA's "special permission and assistance" to add a cancer warning. Like all pesticide manufacturers, Monsanto bears primary responsibility for maintaining the warnings on its label. See *Bates*, 544 U. S., at 438 ("[M]anufacturers have a continuing obligation to adhere to FIFRA's labeling requirements"). To the extent it needs the EPA's approval at all (more on that below), all it must do is submit an application for an amended registration that reflects the labeling change, which the EPA "shall" approve as long as the change does not violate FIFRA. §136a(f)(1); see 40 CFR §152.44(a). This is a far cry from the contingent chain of approvals a generic drug manufacturer was required to secure in *PLIVA*.

But there is no need for Monsanto to undertake this amended-registration path here. Monsanto can add a cancer warning without the EPA's approval. The EPA's regulations permit pesticide manufacturers to make "minor modifications" to their labels without getting prior approval

from the agency. §152.46. Instead, the manufacturer need only notify the EPA of the change (and in some cases, notification is not even required). *Ibid.*

The majority claims that adding a cancer warning would not be a "minor" modification. *Ante,* at 10–11, n. 5. For support, it relies on the regulation that requires the EPA's approval for "'statements pertaining to the hazards of the product.'" *Ibid.* (quoting §156.70(c)). But that regulation does not apply to chronic conditions like cancer. See *supra*, at 6, and n. 4. The prior-approval requirement for hazard and precautionary statements says nothing about whether cancer warnings also need prior approval from the EPA.

While a cancer warning may not seem like a minor modification, facts on the ground belie that appearance. On at least six occasions, the EPA has permitted manufacturers to add state-specific cancer warnings as minor modifications without the agency's prior approval.[10] Among the manufacturers that have previously added a cancer

—————

[10] See, *e.g.*, Letter from K. Montague, EPA, Office of Pesticide Programs, to L. Zahigian, Lawn and Garden Products, Inc. (Sept. 14, 2017), https://www3.epa.gov/pesticides/chem_search/ppls/054705-00006-20170914.pdf (archived at https://perma.cc/9Y47-RGPK); Letter from K. Davis, EPA, Office of Pesticide Programs, to L. Radevski, Chase Products Co. (June 21, 2017), https://www3.epa.gov/pesticides/chem_search/ppls/000498-000156-20170621.pdf (archived at https://perma.cc/46KX-U46D); Letter from M. Walsh, EPA, Office of Pesticide Programs, to E. Smith, PBI/Gordon Corporation (May 30, 2017), https://www3.epa.gov/pesticides/chem_search/ppls/033955-000394-20170530.pdf (archived at https://perma.cc/6469-9D7S); Letter from M. Walsh, EPA, Office of Pesticide Programs, to C. Zemanek, The Scotts Company LLC (Mar. 1, 2017), https://www3.epa.gov/pesticides/chem_search/ppls/000239-00739-20170301.pdf (archived at https://perma.cc/P9SH-74HV); Letter from J. Urbanski, EPA, Office of Pesticide Programs, to V. Lawless, Wellmark International (Apr. 21, 2015), https://www3.epa.gov/pesticides/chem_search/ppls/002724-00702-20150421.pdf (archived at https://perma.cc/GJR9-FRQ2); Letter from J. Gaines, EPA, Office of Pesticide Programs, to L. Hodges, Bayer CropScience (Dec. 17, 2012), https://www3.epa.gov/pesticides/chem_search/ppls/000264-00343-20131217.pdf (archived at https://perma.cc/P4RU-6X2W).

warning without prior approval is a subsidiary of Monsanto's parent company, Bayer.

*    *    *

The majority reads into FIFRA a labeling requirement that does not exist, and it reads out of FIFRA the statute's ongoing prohibition on misbranding. This interpretation cannot be squared with the text of FIFRA or our precedents. Ultimately, the effect of the majority's interpretation is both remarkable and regrettable, for it unjustifiably closes the courthouse doors to state tort plaintiffs like Durnell.